SO ORDERED.

SIGNED this 11th day of August, 2017.



_____
Robert E. Nugent
United States Bankruptcy Judge

_____

DESIGNATED FOR ONLINE PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANASAS

IN RE:

CARL JAMES DENNING
                    Debtor.

IN RE:

SOUTHWIND BANK
                    Plaintiff,

vs.

CARL JAMES DENNING,

                    Defendant.

Case No. 15-12558
Chapter 13

Case No. 16-5043

MEMORANDUM OPINION

1

Fraud-based exceptions to discharge of certain debts under 11 U.S.C. § 523(a)(2)(A) require proof by a preponderance of the evidence that the debtor made an untrue representation with the intent to deceive the creditor and that the creditor justifiably relied on the representation to its detriment. The fraudulent intent element is rarely proven by direct evidence. The intent to deceive may be shown by circumstantial evidence. Even then, proof of fraud is difficult. This proceeding is no different.

Southwind Bank alleges that Carl Denning submitted false loan draw requests for a construction remodel project on which the Bank issued a line of credit. It bases this allegation on the facts that it approved and funded thirteen written draw requests over a 7-month period, that Denning exhausted the line of credit, and that the Bank discovered three months later that the project was not completed. It also bases its complaint on the opinion of a construction expert, drawing on his inspection of the property two years later, that some (but not all) of the costs in the draw requests were "high," "unreasonable," "inflated," "inaccurate," or never incurred and were therefore false. The Bank's evidence at trial fell short of proving that debtor made false representations in his draw requests with the intent to deceive the Bank. There is no way to "follow the money" on this record because the Bank never offered a paper trail that would show Denning never incurred the construction expenses he claimed or that he used the loan proceeds for things other than those he represented, evidence that might have supported a finding he intended to deceive the Bank. And, except for the hard wood flooring and kitchen countertops that Denning never obtained, there

2

was no proof that any of the labor and materials described in the draw requests were not used in the project. Because the Bank failed to meet its burden of proving that Denning made false statements with the requisite intent to deceive the Bank, it has failed to establish the first two elements of a § 523(a)(2)(A) claim and cannot prevail on its complaint.[1]

<u>Findings of Fact</u>

In late 2010, Carl Denning acquired an old native stone barn known as the Mills Barn located on a 5-acre site in a rural area between Russell and Gorham, Kansas with the intention of converting the barn to a home for him and his wife to live in. After they divorced, however, Denning decided to proceed with the project but sell the property after its completion. In 2011, Denning installed and paid for a roof on the barn. Because the nearest electrical service was more than a mile away, Denning also contracted with Midwest Energy to install electrical service to the barn at a cost of $22,700. Denning worked on the remodel using his own funds before approaching Southwind Bank in January of 2013 for financing on the project.[2] Denning was an established customer of the Bank and his existing loans were in good standing when he approached the Bank for the barn project.

Denning is a self-employed contractor and has substantial experience in the construction industry, having completed over one hundred projects. Although little

---

[1] Attorneys Dennis R. Davidson and Chasen R. Katz appeared for the plaintiff Southwind Bank. Attorney Dan W. Forker Jr. appeared on behalf of defendant-debtor Carl Denning.
[2] Southwind Bank was formerly known as United National Bank.

detail was provided at trial, Denning apparently had 2-3 other ongoing construction jobs at the time of the Mills Barn project because he used some rented equipment on both the barn project and other construction jobs. The Bank financed at least one of Denning's home construction jobs in 2010-11 and he was the contractor on a job for the Bank's president, Vance Ruggels. Denning identified his construction business as Gateway Construction LLC on draw requests, but the loans at issue here were made to Denning as an individual and he signed the draw requests in his individual capacity.

The Loans

In February of 2013, the Bank made a $40,015 lump sum advance for "remodeling expenses" incurred on the barn project.[3] This loan was secured by an assignment of oil royalty interests, not the barn itself, because the Bank required an appraisal in order to take a mortgage. The note's terms obligated Denning to repay the loan in full in six months. There was no evidence concerning what was represented regarding the scope of the project, what the remodeling plan was, or what expenses were authorized to be incurred with the proceeds of the initial loan. Denning projected the project would take 9-12 months to complete. The Bank's president, Vance Ruggels, testified that this loan was made as a bridge loan until the Bank could examine the real estate title and obtain an appraisal, although he did tour and inspect the barn site with Denning prior to the advance of funds. Denning testified that he used an unspecified amount of the loan proceeds to pay unpaid bills on the project.

---

[3] Ex. 1.

4

He had used his own funds to pay for the roof before receiving the $40,015 loan.[4] The Bank did not present any evidence accounting for the loan proceeds nor did it allege or identify any fraudulent misrepresentations made by Denning in connection with the initial loan.

The appraisal prepared for the Bank valued the property, as if improved and completely remodeled, at $240,000 as of March 26, 2013.[5] Armed with that appraisal, the Bank granted Denning a six-month, $125,000 line of credit on May 14, 2013. The line was secured by a mortgage on the property along with his previous assignment of oil royalty interests.[6] Its purpose was described as "investment property remodeling line of credit." At that time, the Bank and Denning lacked either an oral understanding or separate written loan agreement detailing the procedure for requesting and supporting draws. The only documentation of the line of credit was the promissory note which, other than indicating that the line of credit would be disbursed on multiple advances, did not address loan draw request procedures.[7] Mr. Ruggels, who had 31 years of banking experience, admitted that the Bank didn't

---

[4] He later submitted draw requests to be reimbursed for labor on the roof, which he described as the gutter apron. *See* Ex. 5-8.

[5] Ex. 2. The appraiser, Shelly Whitmer, testified that the Bank or Denning provided her with square footage specifications of each floor of the house as finished, but little else for her appraisal process. *See* Ex. 25. The appraisal notes the following intended improvements in addition to the remodel of the existing barn structure: an addition with a 2nd story, porch, fireplace, patio, and a 24' x 30' two car garage. With the addition, the appraisal states the 3-bedroom home will have 2,864 square feet of living area.

[6] Ex. 3, 4.

[7] The note form contains a space for filling in the "conditions for future advances." It is blank.

5

make many construction loans. The Bank and Denning did not discuss whether Denning would be paid for his personal labor on the project. The Bank believed that Denning would provide the bulk of the labor and didn't expect him to "pay himself" for working on the remodel, but apparently never indicated that to Denning. Ruggels admitted at trial that Denning could submit draw requests for materials that were ordered, but not yet delivered. Immediately after the May note, the Bank made between $5,000 and $10,000 of disbursements on oral draw requests made by Denning. Then the parties agreed that subsequent requests would be made in writing. Over the next two and a half months (June to mid-August), the Bank disbursed $73,940 on five written draw requests.[8]

On August 16, 2013, the Bank renewed the original $40,015 loan for another six months.[9] The Bank believed the project was on track and renewed the loan based upon Denning's assurance that it should be completed in another six months. The Bank did not physically inspect the property prior to renewing the loan. The Bank asserts no misrepresentations by Denning to obtain the renewal.

Commencing on August 19, 2013 Denning submitted three more written draw requests totaling $19,000 on which the Bank disbursed the line of credit funds.[10] By mid-September, the Bank had disbursed a cumulative total of $92,940 on written draw requests plus an additional $5,000-$10,000 on the early oral requests.

---

[8] Ex. 5-9.
[9] Ex. 10.
[10] Ex. 11-13 (All three requests were for "sheetrock labor/material.").

6

Sometime in September, Denning provided the Bank an update on the project advising that the sheetrock and painting were done and that he had purchased kitchen cabinets for installation.[11] He requested an additional $30,000 to put in flooring and finish the remodel as he began showing the house, bringing the total amount loaned under the line of credit to $155,000. He reported that he had received "very positive feedback" from potential buyers. According to Ruggels, by this time the $125,000 line of credit was nearly "maxed out."[12] He understood Denning's progress report to mean that there had been cost overruns on the project that necessitated the additional $30,000 to complete. Denning followed up his progress report with a September 17 e-mail to Ruggels, asking whether the Bank had decided on his additional funding request.[13] On September 19, Denning submitted his ninth draw request of $900 for "labor" and the Bank disbursed on it.[14]

The Bank agreed to fund the additional $30,000 and on October 2, 2013, Denning executed an additional $30,000 note bearing a maturity date of December 31, 2013.[15] This note was also secured by the real estate mortgage and the oil royalty interests. The Bank did not inspect the project before extending this additional credit to Denning. Immediately thereafter Denning submitted his tenth draw request on

---

[11] Ex. 14.

[12] If so, the Bank's estimate that it disbursed $5,000-$10,000 of the line of credit on oral draw requests in May before Denning started submitting written requests, was understated by more than $20,000. Eight written draw requests of $92,940 (Ex. 5-9, 11-13) plus $10,000 oral draw requests equals $102,940.

[13] Ex. 14.

[14] Ex. 16.

[15] Ex. 15.

7

October 3, 2013 in the amount of $13,717, followed by his last three draw requests on October 28 ($12,895), November 10 ($2,000), and December 26 ($1,200).[16] These four draw requests total $29,812, and with the September 19 $900 draw request total $30,712.

The Bank approved and disbursed on all of the draw requests as presented by Denning without requesting any additional information or more detail in the requests. The draw requests offered by the Bank into evidence contain no markings or annotations that would suggest they were meaningfully reviewed by an officer before approval and disbursement.

Late in March of 2014, Ruggels' wife saw photos of the property posted by a realtor on social media and showed them to him. Ruggels was surprised to see that the remodel was unfinished and the interior was nowhere close to completion. Ruggels contacted Denning who gave him access to the barn property. When Ruggels inspected it, he discovered that no flooring, countertops, plumbing fixtures, door knobs, bathroom cabinets, or fixtures had been installed and that considerable trim and finish work remained to be completed. The interior walls had been sheet rocked, kitchen cabinets installed, and the plumbing and electrical had been "roughed in." There were animal droppings throughout the home. No outside air conditioner condenser units were installed or on the site, although the inside compressor units had been roughed in. Following his inspection Ruggels called Denning into the Bank for a meeting. Ruggels told Denning what he had discovered in his inspection and

---

[16] Ex. 17-20.

8

advised Denning that the Bank would not fund any more on the project. He told Denning that he needed to finish the remodel quickly with his own money, get the property sold, and repay the loans. Ruggels was upset with the condition of the property and accused Denning of not doing the work represented in his draw requests. Denning acknowledged that it "looked bad" from the Bank's perspective and admitted he needed to complete the project, but he didn't admit or deny that the draw requests were false. On March 31, 2014, the Bank consolidated and renewed Denning's three debt obligations ($40,015, $125,000, and $30,000) into a single note in the amount of $194,786.25, which Denning signed.[17] That note called for eight monthly interest payments of $1,000 with a final balloon payment on December 31, 2014.

Barn Remodel Progress

Ruggels testified that he inspected the property on a tour of the property with Denning within a few days of the Bank making the first $40,015 loan in early 2013. He didn't describe in detail what this inspection revealed or whether remodeling work had already been done at that time, but he did testify that photos contained in the March 26, 2013 appraisal accurately depicted the exterior and interior of the barn property when he saw it. Denning testified to the installation of the roof in 2011 after he bought the property and Midwest Energy's electrical service installation sometime prior to the Bank advancing the $40,015.

---

[17] Ex. 21.

9

The best evidence of the barn's condition before the May 2013 $125,000 line of credit is depicted in photographs contained in the March 26, 2013 appraisal of the property.[18] Those photographs reflect the roof's installation, the addition of windows and exterior doors, and front and rear entrance add-ons covered with construction wrap. Inside, rooms had been framed out and a winding stairway had been constructed to an upper loft area, making the structure a 1 ½ story living area. Some plumbing or water lines had been roughed in. There is subflooring. Denning testified that some of the $40,015 loan proceeds were used to pay his outstanding bills for the work depicted in the appraisal photos.

Nothing in the record shows whether any additional remodeling work was performed after March 31, 2014, the date of the loans' consolidation. Denning suffered a detached retina in the spring of 2014 and could not work on the remodeling for several months. He sustained other injuries later that December after a serious fall and was hospitalized for several weeks. Ruggels took no pictures when he inspected the barn in March, 2014, but his description of what he found indicates that in the intervening year, the interior had been sheet rocked, the electrical service had been roughed in, and kitchen cabinets had been installed.

After Denning filed this chapter 13 bankruptcy in late 2015, the Bank retained the services of Kris Munsch to conduct an inspection on July 6, 2016 and prepare a

---

[18] Ex. 2, pp. 13-14.

detailed report.[19] Munsch is an assistant professor of construction management at Fort Hays State University as well as a certified home inspector. He is also a self-employed contractor and provides construction inspection services for financial institutions to verify borrowers' loan draw requests. Munsch used the 2013 appraisal photos as a starting reference point when he inspected the barn. He testified that the only additional completed work he found when he compared the 2013 photos to what he saw in July of 2016 were: completely hung sheetrock with a coat of primer, insulation, installed kitchen cabinets (but not countertops), roughed-in electrical service, and partially installed HVAC equipment inside. The interior was nowhere near the trim or finish stage, the most expensive portion of the remodel. No flooring had been installed and no materials were on site; the floor consisted of OSB (Oriented-Strand Board) board. No plumbing fixtures or countertops had been installed. The work on the exterior was also incomplete. More stonework around windows and re-pointing of stone walls was needed. He believed it would take more than $30,000 to complete the project plus an additional $5,000 to repair the pest and water damage he found in the home when he inspected it. In Munsch's conversation with Denning prior to the inspection, Denning estimated it would take $50,000-$75,000 to complete the project.

The Line of Credit Draw Requests

---

[19] Ex. 23.  Photos attached to a Broker Price Opinion obtained by the Bank later that month, appear to be consistent with Munsch's testimony regarding the status of the project and condition of the property. *See* Ex. 26.

The thirteen (13) written draw requests submitted by Denning to the Bank between June 1, 2013 and December 26, 2013 total $123,652 and form the heart of the Bank's § 523(a)(2)(A) claim.[20] Recall that there was no written agreement concerning how draw requests would be made on either the $125,000 line of credit opened in May of 2013 or the additional $30,000 loan made in October. The Bank estimated that it had made about $5,000-$10,000 in advances based on oral draw requests made shortly after the line of credit was established.[21]

It then requested Denning to submit written draw requests and provide the amount, and materials and labor incurred which Denning did starting with his first written request dated June 1, 2013.[22] There was apparently no discussion or understanding whether Denning could use the line of credit to reimburse himself for barn remodeling expenses he incurred prior to May of 2013 or whether the line of credit was to only be used for remodeling expenses going forward, and nobody questioned the witnesses regarding this at trial.[23] The Bank did not specify what information or detail it wanted in the written draw request. It did not require Denning to provide a completion percentage in his draw requests. Some draw

---

[20] Ex. 5-9, 11-13, 16-20.
[21] The Bank did not present any loan history documents at trial. Presumably, these or similar documentation among the Bank's records would show, at a minimum, the dates and amounts of every disbursement on the line of credit. By the Court's calculation, the oral draw requests were substantially more than $10,000; a total line of credit of $155,000 less $123,652 accounted for in written draw requests leaves the remainder of $31,348 attributable to oral draw requests.
[22] Ex. 5.
[23] It appears the Bank approved written draw requests for expenses incurred prior to May (*e.g.* Ex. 5 - lumber and Midwest Energy).

requests merely stated "materials" and "labor," without specifying the remodeling task for which the materials were used and labor was performed, and in the case of labor, the identity of the person performing the work or the hours and rate of pay were not detailed.[24]  Nor did it require Denning to furnish supporting invoices or receipts evidencing the amount of the draw request. Denning testified that he used the same draw request form for this remodel project that he had previously used on another Bank-funded project in 2010-11 that he referred to as the "Mueller" project. Ruggels testified that the Bank approved and disbursed on each draw request, never questioned any information on the draw requests, and never requested additional information or supporting receipts or invoices. The Bank made no progress inspections during the time that Denning was submitting the draw requests.

At trial, Ruggels testified regarding each of the written draw requests. He identified what he considered to be items that were too high on the draw requests. But when asked on cross-examination if he had any proof that Denning had not incurred the charges or used the labor and materials on the barn project, Ruggels admitted he had none. Ruggels could not identify a single misrepresentation made by Denning in the written draw requests.

That task fell to Mr. Munsch. In his testimony, Munsch noted that the major remodel work remaining after the 2013 appraisal was insulation, sheetrock, electrical rough-in, flooring, cabinets, countertops, plumbing fixtures, and trim or finish work. Munsch took no issue with some areas of the remodeling expenses. He indicated that

---

[24] *See* Ex. 6, 7, 16, 19, 20.

13

the spray insulation expenses were reasonable. For those draw requests that did not describe or itemize "materials" or "labor," Munsch expressed no opinion on their truthfulness.[25] He also found the "electrical" rough-in charges to be accurate.[26] He opined that the labor for stonework to re-point the mortar was necessary and while it is labor intensive work he had no opinion what a fair charge would be to re-point the barn stonework. He also stated that stonework repair was not completed. Munsch also acknowledged that the rental equipment charges for a telehandler were reasonable. Apart from comparing his inspection results to the 2013 appraisal, Munsch identified no other information or materials that he reviewed or relied upon in determining whether the draw requests contained false representations.

Some charges Munsch testified were false because he characterized them as "additional" material or expenses that were excessive or not incurred, given that no additional framing or plumbing work had been done after the 2013 appraisal.[27] In arriving at this conclusion, Munsch seemingly ignored the possibility that Denning incurred these expenses prior to the line of credit and was seeking reimbursement after-the-fact. And the Court heard no evidence that Denning was precluded from submitting draw requests for remodeling expenses he incurred prior to the line of credit.

---

[25] Ex. 16, 19, 20. Denning said he billed his labor on the remodel project at $35 per hour.
[26] Ex. 7, 18.
[27] *See* Ex. 5 (lumber), Ex. 18 (plumbing).

14

The "sheetrock labor/material" charges were contained on three invoices in August-September and totaled $19,000.[28] Munsch said this was "false," because in his opinion, a project of this size with a large open space area would only run $8,600. But Denning testified the labor charges were higher than usual because much of the sheetrock was hung from 20 foot ceilings (as opposed to ground level) and he had to hire that work to be done. He personally did the taping of the sheetrock.

Munsch opined that the Midwest Energy charges on several draw requests were false and well outside the norm because there were only two useable work circuits in the barn and no air conditioning was running.[29] In his experience, the *monthly* charge for electrical service on a property under construction ran no more than $75. He also noted that the electric bill is rarely, if ever, the same amount from month to month. Munsch was unaware of the 1 1/2 mile electric service line installation that Denning said he installed at a cost of $22,700, payable over 5 years at $370 per month, but insisted that Midwest Energy does not finance service installations for customers over time.[30] He also testified that if a camper was hooked up and on site for workers to stay in as Denning indicated, that additional electric usage would have been minimal. The five draw requests that included Midwest

---

[28] Ex. 11-13.

[29] Ex. 5 ($1,122 through 6/1/13), Ex. 6 ($887 dated 6/16/13), Ex. 7 ($422 dated 7/8/13), Ex. 8 ($422 dated 7/22/13), Ex. 9 ($422 dated 8/1/13)

[30] The Court notes that Midwest Energy filed a proof of claim in March of 2016 for "utility services" in the amount of $8,325, of which $7,225 was principal. *See* Claim 7-1. Denning scheduled the debt to Midwest Energy (c/o H. Kent Hollins) in the amount of $7,980, far more than the cumulative $75 monthly electrical service for construction would have been that Munsch referenced.

15

Energy charges were submitted between June 1 and August 1 and totaled $3,275.[31]

The $370 installation payment plus monthly usage charges of $75 would yield a

monthly bill of $445.[32]

When the electrical work was roughed-in, two HVAC indoor compressor units

were set as well. Denning submitted a draw request on June 16, 2013 for the "HVAC"

in the amount of $15,877.[33] Neither Ruggels nor Munsch found the outside condenser

units on-site or installed for the HVAC system during their inspections. Denning

testified that the two condensers were being stored at his shop to prevent their theft

and had been there for a year and a half. Munsch opined that the draw request was

very high given that only part of the equipment was roughed-in. He estimated that

the cost of equipment alone would only be $6,000.  Denning testified that he used

hired labor for installation of the compressor units and ductwork for the HVAC that

was included in the draw request.

Denning submitted two draw requests for the kitchen cabinets he personally

installed at a total cost of $11,165.[34]  He had to pay the vendor The Cabinet Guys in

full at the time he ordered the cabinets. Munsch believed these draw requests were

false because the kitchen cabinets were of low-to-medium tier quality, off-the-shelf

---

[31] Again, the first written draw request states it is "[t]hrough 6-1-13" indicating that
the amounts may be cumulative from prior periods. *See* Ex. 5. This draw request
alone sought disbursement of $1,122 for Midwest Energy and could include prior
months' charges that were unpaid.
[32] Three of the draw requests regarding Midwest energy were in the amount of $422.
*See* Ex. 7-9.
[33] Ex. 6.
[34] Ex. 9 and 17

16

cabinets and the amount sought to be reimbursed was inflated. Denning denied that the kitchen cabinets were of low quality; he ordered custom-designed cabinets through The Cabinet Guys, which also helped Denning with the kitchen-design, and he rated their quality a 4 on a scale of 1-5. He did acknowledge that the price of the cabinets included their installation charge; he substituted his labor for the installation charge.

Denning submitted a draw request on October 3 that included a charge for flooring of $9,456 and one on October 28 for kitchen counters of $2,245.[35] These requests came immediately after he signed the $30,000 note with the Bank on October 2. Munsch concluded the representation in these requests were false because Denning never installed the flooring or countertops. Denning testified that he had ordered the flooring when he made the October 3 draw request and intended to take delivery, but cancelled the order when prospective buyers expressed an interest in buying the barn. He wanted to be able to supply flooring that they might specify. Similarly as to the countertops, Denning intended to fabricate them himself and to order the materials when he requested the October 28 draw. He did not order the materials when the prospective buyers asked about the counters. Then, after having received the money but not obtaining the materials, he said he became unable to work for a period of time. The house did not sell. Denning did not return the money he was disbursed for these two items, though there is no proof about how he spent it.

The Bank's Claim

---

[35] Ex. 17 and 18.

17

Denning filed this chapter 13 case on November 30, 2015 and the Bank filed its § 523(a)(2)(A) nondischargeability complaint on March 4, 2016. The Bank filed a proof of claim in the amount of $266,540.81 which includes the consolidated note at issue here in the amount of $206,808 on the petition date.[36] The secured portion of the Bank's claim is $162,275.[37] The Bank advised at trial that its claim did not reflect post-petition oil royalty payments applied to the consolidated note that would reduce the amount of its claim, but did not specify the current outstanding balance.[38] Nor did the Bank assert at trial the amount of Denning's indebtedness that it claimed should be declared nondischargeable based upon the evidence. Because the Bank's § 523(a)(2)(A) claim is centered on the alleged falsely represented written draw requests, the most that could be excepted from discharge would be $123,652, the total amount disbursed from the line of credit on those thirteen draw requests.[39]

<u>Analysis and Conclusions of Law</u>

This matter came on for trial after the Court denied Denning's motion for summary judgment.[40] At the close of the Bank's case-in-chief, Denning orally moved

---

[36] *See* Claim No. 6-1 and Ex. 22. The Bank's claim includes three other notes: an April 2013 note for purchase of a 2012 North Trail camper with a $31,025 principal balance, an April 2013 note for purchase of a 2008 Jeep Wrangler with a principal balance of $13,043, and a November 2012 note to refinance a 2010 Toyota Tundra 4x4 with a principal balance of $13,658.

[37] On July 28, 2016 the Bank obtained a Broker Price Opinion (BPO) of the current market value of the barn property -- $45,500. *See* Ex. 26

[38] *See* Ex. 22. Under Denning's chapter 13 plan he surrendered the Mills Barn property and oil royalty interests to the Bank. *See* Doc. 78, ¶ 8.

[39] *See* Adv. Doc. 34 – Pretrial Order, pp. 2-4 (Nature of Case and Stipulations).

[40] Adv. Doc. 42.

18

for judgment on partial findings under Fed. R. Civ. P. 52(c).[41] The Court denied that motion for the reasons stated on the record, and Denning presented his case.

The burden of proof of fraud for §523(a)(2) purposes is preponderance of the evidence, a lower standard than is applied in non-bankruptcy fraud cases. Even so, the discharge exceptions should be narrowly construed in favor of debtors and any doubts resolved in debtor's favor.[42] The Bank had to prove that it is more likely than not that Denning's requests for draws amounted to knowingly fraudulent statements made with the intent to deceive the Bank upon which it justifiably relied to its detriment.[43] The Tenth Circuit considered the standards for determining § 523(a)(2)(A) complaints in *Fowler Bros. v. Young*, where it said—

> Thus, to establish that a claim is nondischargeable under this subsection, the creditor must prove the following elements by a preponderance of the evidence, *see Grogan v. Garner,* 498 U.S. 279, 287, 111 S. Ct. 654, 659, 112 L.Ed.2d 755 (1991): The debtor made a false representation; the debtor made the representation with the intent to deceive the creditor; the creditor relied on the representation; the creditor's reliance was reasonable; and the debtor's representation caused the creditor to sustain a loss.[44]

Later, in *In re Riebesell*, the Tenth Circuit noted that, in keeping with the Supreme Court's holding in *Field v. Mans*,[45] "'reasonableness' in the sense of whether an

---

[41] Fed. R. Bankr. P. 7052 makes Rule 52(c) applicable in adversary proceedings.

[42] *See Grogan v. Garner,* 498 U.S. 279, 287 (1991) (adopting a preponderance of the evidence standard); *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar),* 125 F.3d 1358, 1361 (10th Cir. 1997).

[43] False representations within meaning of § 523(a)(2)(A) are representations knowingly and fraudulently made that give rise to debt. *In re Osborne,* 520 B.R. 861, 868 (Bankr. D. N.M. 2014).

[44] *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).

[45] 516 U.S. 59, 74-75 (1995).

19

objectively reasonable person would have relied upon the debtor's false representations" is not the test.[46] Rather, the court must determine whether the "actual creditor's reliance was 'justifiable' from a subjective standpoint."[47] This implicates the "qualities and characteristics of the particular plaintiff and the circumstances of the particular case," not a "community standard of conduct" in all cases.[48] Thus, while the plaintiff may not rely on obvious or known false statements that are made apparent by one's senses from a cursory glance, a plaintiff's "lack of care does not exculpate [a debtor's] fraud and dishonesty."[49]

Courts that have decided § 523(a)(2)(A) claims also conclude that the fraudulent intent required need not be shown by direct evidence, but may be inferred from the totality of the circumstances.[50] The debtor must have acted with the subjective intent to deceive the creditor.[51] The essence of this inquiry is whether the

---

[46] *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 791 (10th Cir. 2009).

[47] *Id.* at 792.

[48] *Id.*

[49] *Field v. Mans,* 516 U.S. at 71; *Sanford Institution for Savings v. Gallo,* 156 F.3d 71, 76 (1st Cir. 1998) (Absent warning signs [*i.e.* obvious or known falsity], plaintiff is not required to conduct an investigation to ascertain falsity); *Guske v. Guske (In re Guske),* 243 B.R. 359, 363 (8th Cir. BAP 2000) (noting that the justifiable reliance standard is "fairly low" and permits a party to justifiably rely on a misrepresentation even when the party could have ascertained its falsity by conducting an investigation); *In re Osborne,* 520 B.R. 861, 869-70 (Bankr. D. N.M. 2014) (investigation required where "red flags" raise questions as to the veracity of the representations; creditor justifiably relied on debtors' false representation that property was unencumbered).

[50] *Groetken v. Davis (In re Davis),* 246 B.R. 646, 652 (10th Cir. BAP 2000), *aff'd in part, vacated in part* 2002 WL 1044832, 35 Fed. Appx. 826 (10th Cir. May 24, 2002); *Copper v. Lemke (In re Lemke),* 423 B.R. 917, 922 (10th Cir. BAP 2010).

[51] *DSC National Properties, LLC v. Johnson (In re Johnson),* 477 B.R. 156, 169-70 (10th Cir. BAP 2012) (debtor's subjective state of mind -- actual knowledge and belief

20

totality of the circumstances presents a picture of deceptive conduct by the debtor.[52] A court may consider not only debtor's conduct at the time his representations were made but also his subsequent conduct to the extent it indicates debtor's state of mind at the time of the representations.[53]

Determining the truthfulness of Denning's draw requests and his intent are the first steps. Then, if necessary, the Court looks to whether the Bank justifiably relied on any untrue statement in making its loan advances. Finally, the Court must calculate the extent of the detriment suffered by the Bank as a result of its justifiable reliance on Denning's misstatements.

There appear to have been no false statements made in connection with the Bank's first loan. The entire amount of the loan was advanced at once, Denning having already incurred some expenses in the Mills Barn project. Indeed, because the Bank was waiting for an as-built appraisal of the barn to be made, it did not even take a mortgage in the real estate, accepting in its stead a lien on Denning's oil and gas production. Denning told Ruggels he intended to remodel and "flip" the barn and Ruggels visited and inspected it before making the initial loan. We cannot even determine how much of the work was performed before the February loan was made or what was paid for by its advance. In the absence of any proven misrepresentation, we cannot conclude that the $40,015 loan was incurred by fraud.

---

at time misrepresentation was made -- determines whether debtor acted with intent to deceive); *In re Dawson,* 507 B.R. 348, 356 (Bankr. D. Utah 2014).

[52] *In re Davis,* 246 B.R. at 652.

[53] *Id.*

Once the Bank received the appraisal, it made the $125,000 line of credit loan in May of 2013, and written draw requests began June 1. All of the requests appear to have been appropriate. Each draw request amounted to a representation by Denning that he had incurred or was about to incur a certain amount of liability for particular materials, components like cabinets or heating and air systems, utilities, or labor, and needed to pay for them.[54] To show that these representations were false, the Bank needed to demonstrate that, in fact, he hadn't purchased or used what he described in the project.[55] The Bank simply did not demonstrate that any of the advances made before the end of September of 2013 were made as a result of Denning's fraud.

The October 2013 $30,000 loan and attendant advances require further scrutiny. On September 17, Denning e-mailed Ruggels to ask for another $30,000. He stated that he would "like to put in flooring" and continue working while he showed the house to buyers. He said $30,000 "would complete the project less any outbuildings."[56] He signed a note for that amount on October 2 and began to draw the next day. The Bank claims that the October 3, 2013 draw request for flooring and the October 28, 2013 request for countertops contain false representations because the

---

[54] *See In re Dawson,* 507 B.R. 348, 355 (presentation of invoices were representation that funds to be received for the invoice will be put towards the cost of the component listed on the invoice).

[55] *See In re Jacobson,* 485 B.R. 255, 261-62 (Bankr. D. Kan. 2013) (debtor-contractor altered subcontractor invoices and submitted to plaintiffs knowing they were false and for more than his cost).

[56] See Ex. 14.

22

materials for the flooring and counters were never acquired or installed.[57] While their absence sheds light on Denning's intentions when he made the draws, so does his own credible testimony. He testified that when he made the flooring draw, he had already ordered the flooring.[58] He cancelled that order when a buyer indicated interest in the barn, because he preferred to allow the buyer to choose the flooring. He also testified that he intended to purchase materials for the countertops and to build them himself when he made the draw, but again pulled back when the buyer expressed interest in selecting other countertops. And when the barn did not ultimately sell, Denning could not obtain the flooring or the countertops because the additional $30,000 had been fully advanced by the end of December. The record suggests that Denning may have used the money for other unaccounted-for purposes, but standing alone, that isn't enough to prove that he intended to do so when he requested the draws. Compare this set of facts to those in *In re Sturgeon*, where the debtor accepted loan advances to purchase cattle but, instead, used the money to cover margin calls on a commodity account that he had never disclosed to the lender. This, combined with a pattern of other sham acts and misrepresentations, furnished ample circumstantial evidence to support a finding of fraudulent intent.[59] No such pattern emerges here.

---

[57] Ex. 17 and 18.

[58] Recall that Ruggels testified that Denning was permitted to submit draw requests for materials ordered but not yet received. The Bank presented no proof that Denning never in fact ordered the flooring.

[59] *Bank of Cordell v. Sturgeon (In re Sturgeon),* 496 B.R. 215 (10th Cir. BAP 2013). *See also, In re Dawson,* 507 B.R. 348, 356 (debtor used funds received for invoices he presented to issue shareholder distributions and pay overhead rather than applying the funds toward the costs identified in the invoices).

23

The timeline here is also murky. Indeed, nothing in the record establishes that Denning hadn't in fact placed the flooring order when he submitted the draw request and the Bank never elicited from Denning when he canceled the flooring order or when the prospective buyer and potential sale fell through. If he canceled the order prior to submitting the draw request or if the prospective buyer backed out of the sale prior to the draw request, that might suggest intent to deceive. But that didn't happen.

The Bank presented no other evidence concerning Denning's state of mind. Because Denning had accounts at the Bank, the Court assumes it had unfettered access to his checks and account statements. If it didn't, that information was fair game for discovery. Yet, the Bank, who bore the burden of proof, offered no other evidence to support a finding of false representation and intent to deceive. Such evidence might have included checks written for labor and materials on other projects or payments to Denning himself. From this threadbare record, I cannot conclude when Denning asked for these draws in October, he planned to cancel the orders, not do the work, and keep the money.

The balance of the alleged falsehoods are either unproven or were credibly refuted by Denning. The fact that the Bank's witness, Munsch, believed that certain amounts for labor or materials claimed on draw requests were excessive does not necessarily prove the representations were false or were made with the intent to deceive. For example, there is no evidence that Denning overcharged for sheet rock installation other than Munsch's opinion. Missing from the record is any evidence

24

about what sheet rock costs to buy or install, how many square feet were installed, or what a contractor like Denning might have charged or paid for that service. Given that Denning banked at Southwind, the Bank surely had the ability to develop that proof from examining and presenting his checks and deposits to either prove or disprove his expenditures. It didn't.

Likewise, the Bank's concern about the electric bills was adequately explained by Denning's testimony that he was not only paying for usage, but also for installation of the service itself. Munsch's surmises are not a substitute for that. Similarly, Denning's explanation that the "missing" HVAC condensers reside in his shop— placed there to avoid theft—undermines the Bank's claim that he drew funds to purchase them and didn't. Again, bank records and invoices might have supplied persuasive evidence of what was or wasn't paid with loan proceeds, but none were forthcoming.

As to truthfulness, the Bank's reliance on the "before and after" evaluations of the property to demonstrate that Denning hadn't properly applied the advances he took does not persuade me that Denning's draw requests were calculated untruths when he made them. It is difficult to treat an "as-built" appraisal made in 2013 and a broker price opinion of the as-is value of an unfinished dwelling made three years later as an "apples to apples" comparison of value. Both opinions are, to some degree, speculative and each addresses a different set of facts. While there is no question that Denning didn't complete the dwelling, I cannot determine that he didn't *intend* to

25

finish it when he took the loans and advances in 2013.[60] As happens frequently in construction projects, this one ran over budget and overtime. While that is an undesirable outcome, it is not fraud per se.

The Bank failed to carry its burden of proof here. Despite having ready access to all of Denning's banking records, the Bank provided none to the Court. It failed to follow the money from the construction advances to wherever it was spent. The Bank only made two inspections: one at the very beginning, and one at the very end. Munsch's 2016 inspection demonstrates that the project is incomplete, but still doesn't explain what was or wasn't done with the loan proceeds.[61]

Instead, the Bank relies on hindsight to argue that Denning had no intention of finishing the home when he sought the last $30,000 loan in September. Denning represented that he had finished sheet rocking which was true; he submitted the last draw request for the sheetrock work on September 12.[62] He earmarked the additional borrowing to pay for kitchen cabinets, put in flooring and finish the project. The subsequent October draw requests include the final payment on the kitchen cabinets

---

[60] An inability or failure to perform is not, in itself, sufficient evidence of fraudulent intent; debtor must have lacked an intent to perform when the promise was made. *See In re Lemke,* 423 B.R. 917, 923-24 (10th Cir. BAP 2010) ("That Lemke was unable to complete the Home within the cost estimate and time frame expected may show that he is a poor construction estimator or project manager, but it does not show that he never had the intention to complete the Home or repay [the creditor]."); *Chevy Chase Bank FSB v. Kukuk (In re Kukuk),* 225 B.R. 778, 786 (10th Cir. BAP 1998) (fraudulent intent cannot be established solely by proof of nonperformance; failure to perform is not fraud, but a breach of contract).

[61] *See In re Lemke,* 423 B.R. 917, 923 (creditor failed to present evidence as to disposition of funds received from draw requests, despite having access to debtor's bank records).

[62] Ex. 13.

26

and the flooring he ordered.[63] The kitchen cabinets were roughed in. Ruggels himself testified that at the time of Denning's additional funding request he "understood" it was due to cost overruns. The failure to complete the project, whether attributable to cost overruns, the inability to sell the home, Denning's intervening health issues, or some combination thereof, is not fraud. Based upon the totality of the circumstances I am not persuaded that Denning did not intend to finish the project in September of 2013 when he approached the Bank for the additional funding and therefore, cannot conclude that Denning made a fraudulent misrepresentation in connection with the additional $30,000 loan.[64]

Conclusion

Judgment should be entered in favor of Carl Denning and against Southwind Bank on its § 523(a)(2)(A) complaint. Denning's consolidated construction loan debt to Southwind Bank is dischargeable.

# # #

---

[63] Ex. 17.
[64] *See In re Lemke,* 423 B.R. 917, 924 (the amount of work completed and debtor's willingness to execute a new note for the additional funds advanced, points to a conclusion that debtor intended to complete the home).

27